IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

April 11, 2017 Session

**STATE OF TENNESSEE v. ERROL JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 14-00889        J. Robert Carter, Jr., Judge**

_____

**No. W2016-00839-CCA-R3-CD**

_____

The defendant, Errol Johnson, was convicted of two counts of aggravated child neglect, a Class A felony, and two counts of criminally negligent homicide, a Class E felony. The trial court merged the two aggravated child neglect convictions and sentenced the defendant as a violent offender to twenty-two years in the Department of Correction. The trial court also merged the defendant's convictions for criminally negligent homicide and sentenced him to two years. The defendant's sentences were ordered to be served concurrently for an effective sentence of twenty-two years in the Department of Correction. On appeal, the defendant argues that the evidence is insufficient to support his convictions for aggravated child neglect and that the trial court imposed an excessive sentence. We conclude that the evidence is sufficient to sustain the jury's verdict and affirm the judgments of the trial court. However, because aggravated child neglect is not an enumerated offense included in Tennessee Code Annotated § 40-35-501(i)(2), the trial court erred in its applying the statute and sentencing the defendant as a violent offender at 100% release eligibility. Therefore, we remand the matter for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Stephen C. Bush, Shelby County Public Defender; Harry E. Sayle, III, Assistant Public Defender (on appeal); and Nigel Lewis, Kathy Kent, and Erim Sarinoglu, Assistant Public Defenders (at trial), for the appellant, Errol Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton-Bush

and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

On November 24, 2012, the victim, a 12-year-old girl, died as a result of severe neglect and lack of care. As a result of her death, the State charged the defendant, the victim's father; the victim's mother; and the victim's home healthcare worker, Chasara Jones, each with two counts of aggravated child neglect and two counts of first degree murder. The proof presented at trial is summarized as follows:

On November 24, 2012, Officer Robert Redditt of the Millington Police Department responded to a 911 medical call concerning an "unresponsive or not breathing juvenile female" at 7684 Arapaho, Millington, Tennessee. According to Officer Redditt, he entered the home through the carport and immediately noticed a "horrific odor. It smelled like death to me." Officer Redditt testified that the odor grew stronger as he moved deeper into the house and closer to the victim's room.

As he entered the victim's bedroom, Officer Redditt found the victim sitting on the floor leaning against the bed, and her mother attempting to perform CPR. Officer Redditt noted the defendant was also in the room and was very upset and screaming at his wife. Officer Redditt instructed the mother to lay the victim flat on the floor so CPR could be performed properly. When she did, Officer Redditt noticed numerous sores on the victim's legs. Once the medical team arrived, Officer Redditt left the victim's bedroom and escorted the defendant to the carport.

Shelby County Sheriff's Deputy Darryl Blake testified he was employed by the Millington Police Department in 2012 and responded to the 911 call concerning an unresponsive juvenile on November 24, 2012. Deputy Blake testified that the "smell in the house took your breath away," and, as he walked to the victim's room, "the worse the smell got." Deputy Blake also noted the house was unorganized and the kitchen was full of dirty dishes. When Deputy Blake entered the victim's bedroom, he noticed she had thick bandages on both feet. He also noticed fly strips hanging all around her room that were full of flies. Deputy Blake testified "the floor was very, very sticky and just brown." He stated that "the white mattress was completely dark in most spots where you could tell someone was lying." According to Deputy Blake, the defendant was very angry and repeatedly stated "someone was going to pay if something happened to his baby."

- 2 -

Because the defendant refused to take his wife, the victim's mother, to the hospital with him, Deputy Blake offered to take her. According to Deputy Blake, the defendant said his wife could not ride with him because he would do "something" to her if something happened to the victim. When they entered the victim's hospital room, nurses were cutting the bandages off her feet. According to Deputy Blake, it took the nurses "about 10 minutes for each foot." Deputy Blake testified that once the bandages started coming off "maggots and everything started falling out of the bandages" and "parts of bones from [the victim's] feet started coming out inside the bandages."

Deputy Blake ran into the defendant as he was leaving the victim's hospital room. According to Deputy Blake, the defendant hugged him and stated, "[I] can't believe we let my baby die." The defendant then immediately changed from "we" to saying "she" and blaming the victim's mother. Finally, the defendant told Deputy Blake, "I work so much. I couldn't believe this was going on. How can I know all this was going on as much as I work?" After witnessing the victim's injuries and speaking with the defendant, Deputy Blake requested a detective be sent to the hospital.

James Slough, a paramedic with the Millington Fire Department, also responded to the 911 call. In describing the odor in the home, Mr. Slough testified the odor got stronger as they moved towards the back of the house. The odor was a "real putrid, rotting flesh smell." "It smelled like a gangrenous wound. A real wretched smell." As he attended to the victim, Mr. Slough could not find a pulse and noted the victim was not in good health and was not breathing. He also noticed that the victim did not have on any clothes from the waist down and she "had blisters and bedsores on [her] inner thighs." Mr. Slough also testified the victim's room was very dirty. There were stains on the floor and the bed. The smell was horrible, and there were maggots on the floor.

Carey Maiden, an emergency room technician with Methodist Hospital, was on duty when the victim arrived at the hospital on November 24, 2012. Ms. Maiden, who also worked as an EMT with the Millington Fire Department, was familiar with the victim. On May 2, 2011, the Millington Fire Department had responded to a "general weakness call" at the victim's home. That day, they had to help lift the victim out of her bed and move her to a stretcher so that she could be transported to the hospital.

On November 24, 2012, the emergency room was notified that a 12-year-old girl in full arrest was being transported. When the victim arrived, the staff "immediately noticed that she was a lot larger than a normal 12-year-old." According to Ms. Maiden, the victim looked as if she was full grown. Ms. Maiden testified they attempted to resuscitate the victim for almost an hour. Despite all their efforts, they were unable to save the victim.

Ms. Maiden testified she aided in preparing the victim's body for transport to the medical examiner's office. Per hospital policy, they are required to keep everything that was on the victim's body with her body, minus bandages and anything used to help resuscitate her. Additionally, all of the victim's sores and wounds needed to be uncovered. Therefore, Ms. Maiden removed the compression boots on the victim's feet and began to remove the bandages underneath. As the new bandages were removed, Ms. Maiden noticed that the new bandages had been placed over the older, dirty bandages, meaning no one had changed the bandages or cleaned the victim's sores in a very long time. Additionally, Ms. Maiden discovered maggot larvae in the bandages. Ms. Maiden testified that it took about twenty minutes per foot to remove the bandages. She even had to change to sharper, stainless-steel scissors in order to cut the thick, hardened bandages. As the bandages were removed, they discovered that the skin was embedded in the bandages, the victim was missing toes on her right foot, and her bones began to fall out as the bandages were removed. According to Ms. Maiden, there was little to no flesh on the victim's feet.

Detective Dennis Brunson with the Millington Police Department was called to the victim's house to investigate the circumstances surrounding the victim's death. As part of his initial investigation, Detective Brunson spoke with the defendant. The defendant informed Detective Brunson that the victim was sick and blamed his wife for not caring for the victim properly. He also informed Detective Brunson that he was suing Le Bonheur Children's Hospital and commented, "I guess this will help my lawsuit."

Detective Brunson testified he could smell the "strong putrid odor associated with death" from outside the house and that the smell was worse once he entered the house. As he examined the victim's bedroom, Detective Brunson noted the victim's mattress was heavily stained. The sheets, the mattress, and the hospital pad on the victim's bed were heavily soiled. He also noticed stained and soiled rags and bandages on the floor of the victim's room. According to Detective Brunson, the victim's room "smelled of rotten flesh." Detective Brunson also found a Tylenol PM bottle and gauze packaging in the victim's trashcan.

As Detective Brunson and other officers searched and inventoried the house, the defendant, who had remained outside, ran into the house and into his room. When Detective Brunson checked on him, the defendant stated "he wished he had went to her when she was crying and moaning" the night before. Detective Brunson also testified that the defendant was "very upset" when they informed the defendant the victim's body could not be released until the medical examiner had concluded the autopsy. According to Detective Brunson, the defendant wanted to have the victim cremated and taken to New Orleans. On cross-examination, Detective Brunson testified that the defendant

refused to allow him to speak with his son and told him that he preferred if Detective Brunson would not talk to his wife.

Charlotte Jones, a victim advocate coordinator for the Memphis Child Advocacy Center, testified that she was working for the Tennessee Department of Children's Services at the time of the victim's death. According to Ms. Jones, on November 24, 2012, she received a priority one referral concerning "allegations of neglect and death" relating to the victim. As a result of the referral, Ms. Jones went to the victim's home where she was immediately met by the defendant. After Ms. Jones introduced herself, the defendant told her that he resented her being there. The defendant stated, "My daughter has been sick for over two years and now that's she's dead DCS and MPD are coming here saying we're bad parents." The defendant also told Ms. Jones that they were not receiving any help and that the care of the victim was "all on his wife." He also informed Ms. Jones of his attempts to sue Le Bonheur Children's Hospital and TennCare.

Ms. Jones testified the first thing she noticed about the victim's room was it smelled like "rotten flesh or a dead animal" despite candles and incense burning in the room. She also noticed the mattress and the carpet were heavily stained, and the room was full of fly strips. Ms. Jones testified there were dead flies all over the bathroom and bloody bandages on the floor.

Before Ms. Jones left the house that evening, the defendant presented her with a box containing the victim's medical records. The defendant told Ms. Jones that the documents in the box showed they had tried to get help for the victim, but no one would help them. Ms. Jones testified that the defendant called her twice after she left, requesting that the victim's body be released so he could have her cremated. When Ms. Jones went to check on the family the next day, no one was home.

Agent Douglas Pate with the Tennessee Bureau of Investigation ("TBI") testified he was a criminal investigator in the Healthcare Fraud Division and was assigned to investigate the victim's death, including the home healthcare company Interim Home Healthcare. Agent Pate testified that, as part of his investigation, he interviewed the defendant on December 16, 2013. As the defendant talked, Agent Pate wrote out the defendant's statement. The defendant then reviewed Agent Pate's notes and, after making a few corrections, signed the statement. In his statement to Agent Pate, the defendant claimed,

> [The victim] is my daughter with Raven Ruth. [The victim] was born January 31, 2000. We also have a son . . . Raven and I are not married. We moved to Memphis on approximately October 8, 2005[,] after the Katrina hurricane in Harvey, LA. I moved here first and then they came

up after me. We first stayed in a hotel in Natchez, MS. We first lived in the Magnolia Suites hotel in Millington and then to the house in Millington on 7684 Arapaho St. We stayed there until November 25, 2012[,] the day after I found [the victim] passed away. I moved out of the house that I rented by December 15, 2012.

[The victim] was fine until February 7, 2011[,] when she got sick after we went out to eat on January 31, 2011. [The victim] ate the same dish as me at TGI Friday's in Bartlett. I asked them to make her dish without shrimp, but I feel like they just took out the shrimp and that made her sick. [The victim] was allergic to any kind of seafood. We carried [the victim] to Le Bonheur and she stayed until February 14, 2011.

[The victim] seemed okay when she was released, but on February 21, 2011[,] she got very sick again vomiting bile and her blood pressure was dropping in addition to a high fever. [The victim] stayed for four to six weeks and they were giving her medications that I did not agree with them. They were her antibiotics and [heparin]. [The victim's] blood clotted just like me and [heparin] has a side effect of clotting. The doctors would not listen to me and said they could do what they thought because she was a minor. I have friends in the medical field who told me they did not like the medications. [The victim] did not have toe and foot problems until she was in the hospital, but they became swollen and blue.

The doctors induced her into a coma twice and told us at a meeting that she really died twice. The doctors talked about amputating her legs in front of her upsetting [her] and all of the family. [The victim] went to one more time, but I don't remember when it was. The hospital forced [the victim] out of the hospital and brought [her] and Raven home by ambulance. My son was also sick with what appeared to be a bad [staph] infection.

We had transportation and home health care services for [the victim]. Most of the time the transportation and home health workers would pull in front of the house, but drive off without even knocking on the door. I did not believe that until I was home one day from work. I think the hospital provided some training on how to change [the victim's] dressings. I did not receive any training and the only thing I saw was Raven watching in the hospital.

- 6 -

I had reported to the police when the hospital was kicking her out of the hospital and he said there was nothing they could do. I called TennCare and there was one lady that helped us get more time. [The victim] received home health for a year and a half, but they did not do their job. Raven changed her dressings the best she could, but she was never trained that I know about by doctors, nurses, or home health.

The lack of proficient medical care is what caused the death of [the victim]. The doctors and hospital were arrogant and cocky. I challenged them for their care of [the victim]. Raven tried to befriend the doctors and nurses because she thought [the victim] would receive better treatment, but I wanted the best care for [the victim]. I have pictures, videos, and logs regarding all of this ordeal with [the victim]. I only wanted the best medical care for [the victim] and they were just trying to move her out or into an old folks home. We wanted to [meet] with the administrator and head doctor, but were denied and forced to meet with others that weren't responsible for my child's condition. It was a doctor in New Orleans that told us to stop the [heparin] and she started getting good healthy pink again.

Karen Hess, a registered nurse, testified that at the time of the victim's death, she was an investigator for the State of Tennessee charged with investigating complaints filed with health related boards. Ms. Hess stated that she was assigned to investigate the victim's case, specifically the home health aides that cared for the victim. According to Ms. Hess, home health aides are certified nursing assistants and are not allowed to handle wound care or change bandages. Rather, they help with tasks like bathing, feeding, and transportation. Ms. Hess also testified that Cashara Jones of Interim Home Healthcare was a certified nursing assistant.

Dr. Miguel Laboy, a forensic pathologist, testified that he participated in the victim's autopsy. According to Dr. Laboy, the victim's compression boots were stained and contained maggots and pupa. Dr. Laboy also discovered ulcerations on the victim's back, buttocks, and inner thighs. He testified the victim had gangrenous ulcers on her lower calves and her skin was peeling from the side. The autopsy also revealed the beginning of chronic pneumonia and a lung infection. The victim's heart muscles were slightly thickened and there was fatty tissue in the victim's liver. Dr. Laboy also testified that the victim's toxicology report indicated that she had high levels of Benadryl in her system. He also opined that the victim's wounds would have been extremely painful.

Dr. Laboy testified the victim's medical records revealed a history of "morbid obesity, asthma, eczema, and allergies." The victim was hospitalized in February 2011. She developed septic shock and multiple organ failure requiring vasopressors. Because

of the vasopressors, the victim developed ischemia. According to Dr. Laboy, the victim was discharged with appointments to see several specialists; however, per her medical records, the victim last saw a doctor in October 2011 when she visited the Wound Care Clinic. Dr. Laboy also testified that the victim was supposed to have a home health aid worker three times a week. However, the last visit from a home health aid worker was November 14, 2011.

According to Dr. Laboy, the victim died as a result of neglected care, including infected decubitus ulcers, gangrene of the lower extremities, obesity, and hypertension. The manner of death was homicide.

Dr. Karen Lakin, an expert in the field of child abuse pediatrics, testified that she reviewed the victim's medical records. According to Dr. Lakin, the victim was hospitalized three times at Le Bonheur – February 7-14, 2011, February 24 - late April, 2011, and early May, 2011. On the victim's first trip to the hospital, she presented with nausea, high fever, and diarrhea. When the victim returned to the hospital on February 24, 2011, she presented with more significant problems. In addition to her nausea, high fever, and diarrhea, the victim was vomiting and extremely hypertensive. Based on her condition, the victim was admitted to intensive care. According to Dr. Lakin, the victim had an infection that caused her to go into shock. Additionally, the numerous medications the doctors gave the victim in an effort to regulate her blood pressure caused vasoconstriction in the extremities which, in turn, caused tissue damage to her extremities. When the victim left the hospital in early May 2011, she was 11-years-old and weighed 252 pounds. When she died on November 24, 2012, the victim weighed 200 pounds, and, per the autopsy, had nothing in her stomach.

When questioned about the victim's sores and injuries, Dr. Lakin testified the dry gangrenous tissue was already dead and would not have been painful. However, the areas that had some live tissue would have been very painful because of the exposed nerve endings. The ulcers and pressure sores on the victim's flank, buttocks, and back of her thighs would have been "extremely painful." Not only was the tissue containing the nerve endings eroding, but the victim was lying in a bed that was soaked in urine. The combination of exposed, live nerve endings and a urine soiled mattress would have been excruciating.

Dr. Lakin testified she also reviewed the photographs taken of the victim and her injuries. Based on her review of the photographs, Dr. Lakin opined that the victim had not been seen by a caregiver. Dr. Lakin testified she could not find any record of a caregiver seeing the victim after the October 2011 visit to the Wound Care Clinic. She also noted that the gauze on the victim's feet and legs was completely soaked through.

Dr. Lakin testified the victim would have survived if she had been provided proper medical treatment after her discharge from the hospital. According to Dr. Lakin, the hospital set-up several follow-up appointments for the victim prior to her discharge including one with a psychologist to talk with the victim about possible amputation and the victim's depression. All of those appointments were cancelled.

On cross-examination, Dr. Lakin testified the doctors, in order to keep the victim alive, placed her on a medicine that might have a bad effect on the victim's feet. She also stated that the victim and her parents were resistant to amputation and decided to wait and allow the victim to speak with a psychologist. The doctors suggested, and offered, to send the victim to a rehab facility so she could receive the help she needed; however, the family declined.

Finally, Dr. Lakin testified that the victim would have been aware of her injuries and capable of communicating her pain and discomfort to her parents. Dr. Lakin also noted that the high level of Benadryl in the victim's system was a sign of maltreatment. Dr. Lakin opined the victim was likely given the Benadryl to help her sleep. At the conclusion of Dr. Lakin's testimony, the State rested.

The defendant's first witness was Bhalmesh Naik. Mr. Naik testified that he worked with the defendant at a cab company. He described the defendant as "hardworking," "dependable," and "willing to help." According to Mr. Naik, the defendant worked 12-14 hours a day, seven days a week. The defendant's next witness, Kevin Warr, also worked with the defendant at the cab company. He too testified that the defendant worked 12 hours a day, seven days a week.

The defendant's mother, brother, and sister also testified on his behalf. Similar to the testimony of his co-workers, the defendant's relatives testified that he was a hard worker and a truthful person.

Miriam Butler, a home health nurse, also testified for the defense. Ms. Butler testified the victim was one of her patients when she worked for Interim Healthcare in 2011. Ms. Butler claimed the victim's wounds were surgical wounds and not pressure ulcers. She also testified that she provided wound care for the victim and that the victim's wounds were not gangrenous at the time she cared for her. According to Ms. Butler, the victim's mother would change the dressings on the days Ms. Butler did not come to the house. Finally, Ms. Butler stated the victim's mother was the victim's primary caregiver and the person Ms. Butler knew. According to Ms. Butler, she did not know, and would not recognize, the defendant.

On cross-examination, Ms. Butler admitted she last saw the victim in November 2011. Ms. Butler also admitted that during a work meeting she learned the defendant had called Interim Healthcare and stated he did not want anyone to come back to the house.

The defendant was the final witness presented by the defense. The defendant testified the victim, his daughter, was highly allergic to seafood and became very sick because of her allergy in February 2011. As a result, he took her to Le Bonheur Children's Hospital where the victim stayed for a week. However, nine days after being discharged, the defendant had to bring the victim back to the hospital. During her second trip to the hospital, the victim flat-lined twice and had to be placed in a medically induced coma.

When the victim came out of her coma, her toes and legs were black. According to the defendant, the doctors told him it was a result of the medication she received. The doctors also soon began discussing the possible need for amputation with the defendant and his family. The defendant testified that he became upset with the doctors when they mentioned amputation in front of the victim. The defendant wanted to get a second opinion but claimed that no other hospital would speak with him because he had threatened to sue Le Bonheur. Finally, the defendant claimed the victim was forced to leave the hospital. According to the defendant, "They kick[ed] my child out of the hospital without determining talking about she's stabilized. . . . She just came out of ICU a week before. How is she stabilized?"

In addition to blaming the hospital for the victim's health, the defendant also blamed the victim's mother for her deteriorating condition and for not keeping him informed. In short, the defendant claimed the victim's mother was responsible for caring for the victim and informing him of her condition, by way of a daily written report. The defendant claimed he was working a minimum of 112 hours a week and, therefore, was unaware of the victim's deteriorating condition.

The defendant stated that he had been away from the house for 36 hours the day the victim died. He claimed that he came home and found the victim's mother holding a pistol to her head and telling him she was sorry. When he went to check on the victim, she was unresponsive, so he attempted CPR. According to the defendant, this was the first time that he noticed the sores on the victim's body. The defendant testified "I was angry. I was disappointed. I was shocked. I felt betrayed. Because everything – evidentially everything I was told [by the victim's mother] wasn't the truth."

On cross-examination, the defendant maintained that he had no idea the victim was so sick. When asked about the flies in her room and the smell in her room and the house, the defendant claimed that they had "a fly problem" in the house but he had never

seen any flies or maggots on the victim. As for the smell, the defendant admitted the house smelled but claimed it did not get worse over time and he had no idea why the house smelled. The defendant also claimed that neither the victim nor his wife ever told him anything was wrong. According to the defendant, his wife was charged with providing him written reports each day on the victim and never mentioned any issues. The defense rested after the defendant testified.

As rebuttal proof, the State called Ms. Elesia Turner, the director of risk management at Le Bonheur. Ms. Turner testified she met with the defendant for over an hour because he was not satisfied with the care the victim was receiving. Ms. Turner stated that the hospital offered to send the victim to Vanderbilt Children's Hospital in Nashville at Le Bonheur's expense. The defendant refused that offer. She also testified that they agreed to place the victim back on the intensive care floor because the family liked the staff on that floor, but the defendant refused because it would require them to "pack up." At the defendant's request, Ms. Turner arranged for the victim's primary doctor agree to sit down and discuss the victim's medical records with the defendant page by page. The defendant initially agreed and made the appointment. Later, the defendant cancelled the appointment. According to Ms. Turner, the hospital also made arrangements for the victim to enter a rehab facility but the defendant and his wife decided they did not want that. Finally, Ms. Turner testified that there came a point where the defendant was no longer allowed in the hospital because of his foul language and aggressive behavior.

The jury found the defendant guilty of both counts of aggravated child neglect and two counts of the lesser-included offense to first degree murder of criminally negligent homicide. The trial court merged the aggravated child neglect convictions and merged the criminally negligent homicide convictions. Following a sentencing hearing, the trial court sentenced the defendant to 22 years' confinement for his aggravated child neglect convictions to be served as a violent offender at 100% release eligibility. The trial court also sentenced the defendant to two years' confinement as a standard offender for his criminally negligent homicide convictions to be served concurrently to his 22 year sentence.

The defendant subsequently moved for a new trial, and the trial court denied the motion. This timely appeal followed.

*Analysis*

On appeal, the defendant presents two issues for our review. First, the defendant contends the evidence is insufficient to support his convictions for aggravated child neglect, arguing "there was no evidence presented upon which a rational trier of fact

could find a continual course of neglectful conduct."[1]  Second, the defendant asserts that the trial court erred in ordering the defendant, who has no prior record, to serve his sentence at 100% as a violent offender pursuant to Tennessee Code Ann. section 40-35-501(i)(2).  The State asserts sufficient evidence exists to sustain the defendant's convictions.  However, the State concedes that the trial court erred in sentencing the defendant to serve his aggravated child neglect sentence at 100% release eligibility pursuant to Tennessee Code Annotated section 40-35-501(i)(2).  Upon our thorough review of the record, we agree with the State concerning the sufficiency of the evidence and affirm the defendant's convictions.  Additionally, we agree with the defendant and the State concerning the defendant's sentence for his aggravated child neglect convictions and remand the matter for the entry of amended judgments setting the defendant's release eligibility at 30%.

**I.     Sufficiency of the Evidence**

In assessing these claims, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

---

[1] The defendant does not challenge his convictions for criminally negligent homicide or the sentences imposed based on those convictions.

*Bolin v. State*, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

In the instant matter, the State charged the defendant under two theories of aggravated child neglect. As charged in Count 1, aggravated child neglect occurs when a person "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare," and serious bodily injury results. *See* Tenn. Code Ann. §§ 39-15-401(b), -402(a)(2). "'Serious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(c).

As charged in Count 3, aggravated child neglect occurs when a person "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare," and the neglect was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim. *Id.* § 39-15-402(a)(3). Our Supreme Court adopted the following definitions for heinous, atrocious, and cruel:

> Heinous—"Grossly wicked or reprehensible; abominable; odious; vile."
> Atrocious—"Extremely evil or cruel; monstrous; exceptionally bad; abominable."
> Cruel—"Disposed to inflict pain or suffering; causing suffering; painful."

*State v. Ashley Bradshaw*, No. W2014-00175-CCA-R3-CD, 2015 WL 523688, at *6-7 (Tenn. Crim. App. Feb. 9, 2015) (citing *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985), *perm. app. denied* (Tenn. May 18, 2015).

Initially, we note that the defendant does not challenge the evidence establishing the fact that the victim suffered serious bodily injury or the fact that the neglect she suffered was especially heinous, atrocious, or cruel. Though the defendant appears to concede these points and focuses his argument on appeal only on his alleged ignorance of the victim's condition and his claim the State failed to prove the "continual course of neglectful conduct," we will briefly summarize the medical and other proof that overwhelmingly established these elements.

- 13 -

Those witnesses who entered the defendant's home on November 24, 2012, testified that the home smelled even when one was outside the home and that the smell increased as one entered the home and moved towards the victim's room. They described the smell several ways – "horrific odor," "smelled like death," "smell [that] took your breath away," "real putrid," "rotting flesh," "smelled like a gangrenous wound," "wretched smell," "putrid odor associated with death," and "rotten flesh or a dead animal." Even the defendant acknowledged his home smelled. Additionally, several witnesses, when questioned about the state of the victim's room, noted such things as numerous fly strips hanging in the room that were full of flies; the floor was brown, dark, and sticky; the victim's mattress was black and heavily soiled; and there were soiled rags and soiled and bloody bandages on the floor. While the conditions in which the victim was made to live in were horrific, the medical proof concerning her condition only further emphasizes the level of the defendant's neglect towards the victim.

Each of the first responders to the 911 call immediately noticed the numerous sores and wounds to the victim's legs and backside. They also noticed the thick bandages on the victim's feet and the soiled compression boots. Additionally, Dr. Laboy testified that the victim's compression boots were stained and contained maggots. He also discovered ulcerations on the victim's back, buttocks, and inner thighs, as well as, gangrenous ulcers on her lower calves. Dr. Laboy opined that the victim's wounds would have been extremely painful and that she died as a result of neglected care, including infected decubitus ulcers, gangrene of the lower extremities, obesity, and hypertension.

Dr. Karen Larkin, an expert in the field of child abuse pediatrics, testified that the gangrenous tissue that was still alive would have been extremely painful because the nerve endings were exposed. Not only were the nerve endings exposed and unprotected in general, but the victim was lying in a bed that was soiled and soaked in urine. According to Dr. Lakin, the combination of exposed nerve endings and the acidic nature of the urine would have been excruciating. Furthermore, and more importantly, Dr. Lakin testified that the victim would have been aware of her injuries and capable of communicating her pain and discomfort to her parents. Finally, both Dr. Laboy and Dr. Lakin testified that, other than a visit to the Wound Care Clinic in October 2011, the victim last received any medical care in May 2011.

Based on the proof as summarized above, it is clear the State established beyond a reasonable doubt that the victim suffered serious bodily injuries as a result of the defendant's neglectful conduct and that the neglect was especially heinous, atrocious, and/or cruel.

Turning to the defendant's claim that he was unaware of the victim's deteriorating condition and how much she was suffering, the proof simply does not support his claim.

- 14 -

As noted previously, the victim's room, as well as the rest of the house, wreaked of "death" and "rotting flesh." According to one witness, the odor was so putrid and strong that incense and candles burning in the victim's room could not cover it. Additionally, the victim's bed and floor were soiled. Her room contained numerous fly strips that were full of dead flies, and there were soiled and bloody bandages on the floor. While the defendant attempts to rely on the fact that the bandages on her feet were clean and white, the testimony reveals that her compression boots were brown and soiled. Additionally, the defendant was aware that the victim's feet and legs were in such a condition because the doctors had suggested amputation in April 2011. The defendant was also aware of the fact that the victim's condition had deteriorated since the initial suggestion of amputation because he bought a portable toilet for her due to the fact she could hardly walk.

In light of the obvious nature of the victim's wounds and sores, the state of the victim's room, the smell in the house, and the defendant's knowledge that the victim's feet and legs were in such a condition that the doctors felt amputation was necessary, the evidence of the defendant's knowledge of the victim's deteriorating condition is overwhelming. By finding the defendant guilty of aggravated child neglect, it is clear that the jury weighed the evidence presented by the State against the defendant's claim that he was ignorant of the victim's condition and accredited the State's proof over the defendant's claim which is solely their purview. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Finally, relying on *State v. Adams*, 24 S.W.3d 289 (Tenn. 2000), the defendant argues that the State also failed to find "a continuing course of neglectful conduct." In support of this claim, the defendant argues that he took the victim to the hospital or "called 911 when she got sick, so that she could get medical treatment she needed," and "even if one could construe [the defendant's] inaction to constitute neglect, the fact that he acted promptly to get [the victim] to the hospital so that she could receive the medical help she needed rebuts any intimation of neglect." However, as correctly noted by the State, the Court in *Adams* held "the offense [of child neglect] continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect." *Id.* at 296. Therefore, the defendant's neglect in the instant matter began at some point in late 2011 when he made the decision not to take the victim to see the specialist the hospital had recommended, made the decision to fire the home healthcare company that was helping the victim, and, in short, made the decision not to provide the victim with any further medical treatment. Though the defendant called 911 on the day the victim died, his action, while a step towards remedying the neglect, did not negate his obvious neglect of his child during the preceding year and a half. *See Ashley Bradshaw*, 2015 WL 523688, at *7 (appellant's

actions in immediately seeking medical help for the victim does not serve to negate her neglectful conduct).

Based on the foregoing, the evidence presented at trial is sufficient to support the defendant's convictions for aggravated child neglect. Accordingly, the defendant is not entitled to relief.

## II.    Excessive Sentence

Finally, the defendant, relying on this Court's opinion in *State v. Vernica Shabree Calloway*, No. M2011-00211-CCA-R3-CD, 2014 WL 1394653 (Tenn. Crim. App. April 4, 2014), *perm. app. denied* (Tenn. Sept. 25, 2014), contends that the trial court imposed an excessive sentence by erroneously sentencing him pursuant to Tennessee Code Annotated section 40-35-501(i)(1)-(2). The State concedes the defendant's sentence is improper. After a thorough review of the record and the applicable law, we agree and remand to the trial court for a new sentencing hearing.

In our review of the defendant's convictions and sentences for aggravated child neglect, we first note our Supreme Court concluded in *Dorantes*, that, as a result of the 1998 amendment to Tennessee Code Annotated section 39-15-402, "aggravated child abuse and aggravated child neglect [are] separate offenses." 331 S.W.3d at 385 n. 15. Additionally, in *Vernica Shabree Calloway*, this Court relying on *Dorantes*, concluded Tennessee Code Annotated section 40-35-501(i)(1) did not apply to convictions and sentences for aggravated child neglect. *Vernica Shabree Calloway*, 2014 WL 1394653, at *41. Specifically, this Court held that because aggravated child abuse and aggravated child neglect are separate offenses and because only aggravated child abuse is included in the enumerated offenses in Tennessee Code Annotated 40-35-501(i)(2), then aggravated child neglect is not a conviction for which 100% release eligibility is required. *Id*. We see no reason to depart from the holding in *Dorantes* or *Calloway*.

Therefore, we agree that the defendant should have been sentenced as a Range I, standard offender to serve his sentences for aggravated child neglect at 30% release eligibility rather than as a violent offender at 100% release eligibility. Accordingly, we reverse the defendant's sentence and remand the matter to the trial court for a new sentencing hearing.

### *Conclusion*

Based on the foregoing authorities and reasoning, we remand this matter for a new sentencing hearing. In all other respects, the judgments of the trial court are affirmed.

_____

J. ROSS DYER, JUDGE